John Buse (CA Bar No. 163156)
*pro hac vice* application pending
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone:    (323) 533-4416
Fax:             (415) 436-9683
jbuse@biologicaldiversity.org

Amy Atwood (OR Bar No. 060407)
*pro hac vice* application pending
CENTER FOR BIOLOGICAL DIVERSITY
PO Box 11374
Portland, OR 97211-0374
Telephone:    (503) 283-5474
Fax:             (503) 283-5528
atwood@biologicaldiversity.org

Attorneys for Plaintiff
CENTER FOR BIOLOGICAL DIVERSITY

## UNITED STATES DISTRICT COURT
### DISTRICT OF ARIZONA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | Civil Case No. |
| Plaintiff | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | ) ) | |
| KEN SALAZAR, Secretary of the Interior; UNITED STATES FISH AND WILDLIFE SERVICE, | ) ) ) | |
| Defendants. | ) ) ) | |

**INTRODUCTION**

1.      Plaintiff Center for Biological Diversity (the "Center") brings this case challenging the United States Fish and Wildlife Service's ("FWS") issuance of a permit that allows endangered Mexican gray wolves to be captured, relocated, and kept in captivity for an indefinite period.  The permit and FWS's biological opinion for the permit violate the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*  The Center seeks declaratory and injunctive relief to halt these ongoing violations of federal law.

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c) and (g) (action arising under ESA citizen suit provision), 5 U.S.C. § 702 (judicial review of agency action under the Administrative Procedure Act), and 28 U.S.C. § 1331 (federal question jurisdiction).

3.      This Court may grant the relief requested under 16 U.S.C. § 1540(g) (ESA citizen suit provision), 5 U.S.C. § 706(2) (Administrative Procedure Act), and 28 U.S.C. §§ 2201 and 2202 (declaratory and injunctive relief).

4.      Pursuant to Section 11(g)(2)(A) of the ESA, the Center provided the Secretary of the Interior (the "Secretary") and Director of the U.S. Fish and Wildlife Service ("FWS") with written notice of the Center's intent to file suit more than 60 days prior to the commencement of this action.  16 U.S.C. § 1540(g)(2)(A).

5.     The Secretary and FWS have not remedied these violations of the ESA.  Therefore, an actual controversy currently exists between the parties within the meaning of the Declaratory Judgment Act.  28 U.S.C. § 2201.

6.     Venue is proper in the District Court for the District of Arizona pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e)(2) because a substantial part of the events giving rise to the Center's claims occurred in this district.

## THE PARTIES

7.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit corporation dedicated to the preservation, protection and restoration of biodiversity, native species, and ecosystems through science, law, and creative media.  The Center has over 41,000 members worldwide, including members who reside within this district and within the current and historic range of the Mexican gray wolf.  The Center has offices in several locations, including Tucson, Arizona; San Francisco, Los Angeles, and Joshua Tree, California; Portland, Oregon; Silver City, New Mexico; and Washington, D.C.

8.     The Center and its members have participated and continue to participate in efforts to conserve the Mexican gray wolf and its essential habitat. The Center's members and staff include persons with educational, conservation, scientific, moral, spiritual and aesthetic interests in the Mexican gray wolf.  Center members and staff live and work in communities within or in close proximity to Mexican gray wolf habitat, including areas outside the Mexican Wolf

Experimental Population Area.  They use, on a continuing and ongoing basis, these areas for educational, conservation, scientific, moral, spiritual and aesthetic purposes, including, but not limited to, aesthetic enjoyment, photography, nature study, and wildlife observation, and intend to continue this use in the future.  The Center and its members further derive educational, conservation, scientific, moral, spiritual and aesthetic benefit and enjoyment from the existence of Mexican gray wolves in the wild.

9.     These interests of the Center and its members and staff are and will be directly, adversely, and irreparably injured by the Secretary and FWS's authorization to capture endangered Mexican wolves, translocate them, and keep them in captivity indefinitely.  The Center and its members will continue to be injured by the Secretary and FWS's unlawful actions until and unless this Court provides the relief prayed for in this complaint.  The declaratory and injunctive relief requested will fully redress the injury.  The Center has no adequate remedy at law.

10.     Defendant KEN SALAZAR is the Secretary of the Interior and is the federal official in whom the ESA vests final responsibility for issuing permits that allow the "taking" of listed species that would otherwise be prohibited by the ESA.  16 U.S.C. § 1539(a)(1).  Secretary Salazar is sued in his official capacity.

11.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior that is charged with implementing the ESA for terrestrial species, including the Mexican gray wolf.

## STATUTORY BACKGROUND

**A.    Endangered Species Act**

12.    The ESA is intended to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species."  16 U.S.C. § 1531(b).  "Conservation" means the use of all methods and procedures to bring any endangered or threatened species to the point at which the protections of the ESA are no longer necessary – that is, to recover species so that they no longer need legal protection.  16 U.S.C. § 1532(3).

13.    When a species is formally listed under the ESA as endangered or threatened, it receives the full range of protections afforded by the ESA.  Foremost among these protections is ESA Section 9's prohibition of unauthorized "take" of listed species.  16 U.S.C. § 1538(a)(1)(B).

14.    The term "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

15.    Section 10(a)(1)(A) of the ESA provides an exception to the general take prohibition of Section 9.  Under Section 10(a)(1)(A), the Secretary may permit acts that could result in the take of listed species "for scientific purposes or to enhance the propagation or survival of the affected species, including, but not limited to, acts necessary for the establishment and maintenance" of nonessential

experimental populations created under Section 10(j) of the ESA.  16 U.S.C. § 1539(a)(1)(A).

16.     ESA Section 10(c) requires the Secretary to publish notice of each application for a Section 10(a)(1)(A) permit in the Federal Register and to provide a 30-day comment period for the submission of "written data, views, or arguments with respect to the application."  16 U.S.C. § 1539(c).

17.     Section 10(a)(1)(B) provides another exception to the take prohibition of Section 9.  Section 10(a)(1)(B) authorizes the Secretary to permit taking that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16 U.S.C. § 1539(a)(1)(B).

18.     ESA Section 7(a)(2) requires that all federal agencies must "insure that any action authorized, funded or carried out by such agency … is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species … determined  …to be critical …"  16 U.S.C. § 1536(a)(2).  To fulfill this mandate, the acting agency must consult with FWS whenever such actions "may affect" a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

19.     Consultation under Section 7(a)(2) results in the preparation of a "Biological Opinion" by FWS that determines if the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify a species' critical habitat.  The Biological Opinion must include a summary of the information on which it is based and must adequately detail and

assess how the action affects listed species and their critical habitats.  16 U.S.C. § 1536(b)(3).  Where an agency action may affect a listed species, the absence of a valid Biological Opinion means that the action agency has not fulfilled its duty to insure through consultation that its actions will neither jeopardize a listed species nor destroy or adversely modify the species' critical habitat.  Agency action cannot proceed without a valid Biological Opinion.

20.     The Biological Opinion must include an evaluation of the direct, indirect, and cumulative effects of the action on listed species.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.12, 402.14(d), 402.14(g)(3).  In addition to effects of other federal actions, "cumulative effects" include "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.

21.     Throughout its analysis, the Biological Opinion must utilize the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d).  FWS must consider all the relevant factors and articulate a rational connection between the facts and its ultimate conclusion.

22.     Section 4(f) of the ESA requires the Secretary to "develop and implement plans … for the conservation and survival of endangered species …" 16 U.S.C. §1533(f). Recovery plans must include a description of site-specific management actions that may be necessary to achieve the conservation and survival of the species; objective, measurable criteria which, when met, would

result in a determination that the species be removed from the list; and estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.  16 U.S.C. § 1533(f)(1).

23.     Section 10(j) of the ESA authorizes the Secretary to establish an "experimental population" of an endangered or threatened species where such population is "wholly separate geographically from nonexperimental populations of the same species."  16 U.S.C. § 1539(j)(1).  The Secretary may authorize the release of an experimental population outside the species' current range if he determines that the release will further the conservation of the species.  16 U.S.C. § 1539(j)(2)(A).  Prior to authorizing the release of any experimental population, the Secretary must determine, on the basis of the best available information, whether the release of the experimental population is essential to the continued existence of the species.  16 U.S.C. § 1539(j)(2)(B).  The ESA affords less protection to those experimental populations the Secretary determines to be not essential to the continued existence of the species, and critical habitat shall not be designated for such populations.  16 U.S.C. § 1539(j)(2)(C).

**B.    National Environmental Policy Act**

24.     NEPA was enacted to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  NEPA effectuates this objective by requiring that federal agencies: (1) take a "hard look" at the environmental consequences of their actions before these actions occur by

ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) make the relevant information available to the public so that it may also play a role in both the decisionmaking process and the implementation of that decision.  *See, e.g.*, 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

25.    NEPA and the regulations promulgated thereunder by the Council on Environmental Quality require that all federal agencies, including FWS, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1501.4.

26.    An EIS must provide a detailed statement of: (1) the environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(2)(C).

/ / /

/ / /

## FACTUAL BACKGROUND

**A.      The Mexican Gray Wolf**

27.      The Mexican gray wolf, also known as the lobo, is the smallest and southernmost subspecies of gray wolf in North America, and is the most genetically and taxonomically distinct of extant gray wolves in North America.

28.      Mexican gray wolves are physically distinct from other North American gray wolves.  Adults weigh 50 to 90 pounds, and reach 26 to 32 inches in height at the shoulder.  In general, their skulls are less massive, dentition is lighter, and build more slender than other gray wolves.  Mexican gray wolves are suited to their generally arid range, and may have adopted larger home ranges than other gray wolves to compensate for the sparser prey base

29.      As a predator, the Mexican gray wolf contributes to the ecological fitness of prey species such as white-tailed deer, mule deer, elk, collared peccary, and bighorn sheep.  Wolves also provide carrion for scavengers such as eagles, badgers, and bears.  The presence of wolves also subtly changes the dynamics between other species, such as foxes and coyotes, and between herbivores such as elk and the vegetation they utilize.  In other regions, the restoration of gray wolves has been linked to increases in vegetative productivity and to overall biological diversity.

30.      The historic range of the Mexican gray wolf cannot be precisely delineated, but included the Sierra Madre Mountains in Mexico almost as far south as Mexico City and the Sky Island Mountains of northern Mexico, southeastern

Arizona and southwestern New Mexico. Mexican gray wolves or intergrades of Mexican and other gray wolf subspecies also roamed far southeastern New Mexico, West Texas, the Mogollon Plateau of Arizona and New Mexico, and possibly further afield, roaming and even breeding across putative subspecific boundaries.

31.     Breeding Mexican gray wolves were probably extirpated from the United States by the 1930s as a result of federal predator control activities, and wolf populations were not allowed to re-establish north of the Mexican border. In 1950, the FWS initiated a program of poisoning wolves in Mexico; consequently, wolves were believed extirpated from Mexico by the 1990s. However, six wolves captured alive in Mexico and one captured in Arizona near the border with Mexico were bred in three lineages that were merged beginning in 1995.

32.     Mexican gray wolves were listed as endangered under the ESA in 1976 (when there were likely none in the United States). 41 Fed. Reg. 17742.

33.     In 1978, all gray wolves in the lower 48 states were listed as endangered, except wolves in Minnesota, which were listed as threatened. 43 Fed. Reg. 9607. The prior listing of the Mexican gray wolf was subsumed in the 1978 listing.

34.     In 1982, FWS released a Recovery Plan for the Mexican gray wolf. One of the goals set in the Recovery Plan is to "Re-establish and maintain viable wild populations of Mexican wolves in at least two areas in Mexico and/or adjoining areas of southwestern United States."

Complaint for Declaratory and Injunctive Relief                          11

35.     The gray wolf listing was modified in 2003 to include three distinct population segments – a Great Lakes population, a northern Rockies population, and a southwestern (Mexican gray wolf) population.  68 Fed. Reg. 15804.  This rule was overturned on January 31, 2005.  In 2009, the FWS issued rules designating distinct populations segments in the Great Lakes and northern Rocky Mountains and delisting these populations, but took no further action on listing of the Mexican gray wolf as either a subspecies or distinct population segment.  The 1978 listing of gray wolves remains nominally in effect for areas outside of the Great Lakes and northern Rocky Mountains, but provides no special recognition for the Mexican gray wolf.

36.     Beginning in 1998, pursuant to ESA Section 10(j), FWS reintroduced an "experimental, non-essential" population of Mexican gray wolves into the Apache National Forest of Arizona and the Gila National Forest of New Mexico (the "Blue Range Wolf Recovery Area").  FWS anticipated that this population would expand to 102 wolves – including 18 breeding pairs – by the end of 2006.  Despite captive-bred wolves bringing down elk and deer, maintaining home territories and raising pups successfully, and their wild-born descendants doing so as well, by the end of 2012, only 75 wolves, including just three breeding pairs, survived in the wild.  All but two of those animals were born in the wild.

37.     Through a rule issued on January 12, 1998 (the "experimental, non-essential rule," 63 Fed. Reg. 1752), FWS authorized the taking of "experimental, non-essential" Mexican gray wolves, including through permitted killing and

capturing.  This authority to take "experimental, non-essential" wolves applies in the Blue Range Wolf Recovery Area as well as throughout a much larger area of Arizona and New Mexico between the I-10 and I-40 highways (the "Mexican Wolf Experimental Population Area").

38.     For several reasons, the reintroduced Mexican gray wolf population has not reached its projected numeric benchmarks.  Federal shooting and trapping in response to wolf predation on livestock, to remove wolves from public, private and tribal lands outside the Blue Range Wolf Recovery Area, and for other reasons has done more than anything else to dampen population growth.  Federal hunters have shot twelve wild Mexican gray wolves since reintroduction began.  Another 18 wolves died through inadvertent consequences of capture.  Thirty-seven wolves have been captured and held indefinitely; at least nine have since died of age-related ailments.  Most of the remainder will never be released.  Dozens of other wolves have been recaptured and returned to the wild, but often in unfamiliar surroundings, separated from packmates, or missing limbs due to trap-injuries, and with a reduced chance of survival.

39.     This population-growth suppression for predator control has aggravated inbreeding in this small population, including through the shooting of a wolf known to be genetically irreplaceable.  Ongoing inbreeding depression is causing small litter sizes and low pup-survival rates.  Predator control thus directly impairs recovery of the Mexican gray wolf.  Those deleterious effects are further exacerbated by the paucity of releases of wolves from the captive breeding

program.  Although scientists have urged many new releases to combat

inbreeding, just one new wolf has been released into the wild over the past 52

months, and that wolf was promptly captured just three weeks after his release.

40.     Since the Mexican wolf reintroduction program commenced, at least

46 wolves have been killed by poachers and another 14 have been struck and

killed by vehicles, with many of those strikes not reported as required under the

January 12, 1998 experimental, non-essential rule (63 Fed. Reg. 1752).  These

losses further impair recovery of the Mexican gray wolf.  Strikingly, this high

level of law-breaking coincides with the federal trapping and shooting program

which is largely premised on conciliating wolf opponents and thereby reducing

illegal killings.

41.     There have thus been an estimated 93 human-caused wolf deaths

since reintroduction began, while a total of 101 captive-born wolves have been

released in the wild.  The high rate of human-caused mortality and removal has

prevented the Mexican gray wolf from reaching the interim population objective

of 100 wolves, and the 18-breeding-pair projection set by the FWS, and has also

rendered the reintroduced population vulnerable to extirpation from any uptick in

the already high mortality rate, exacerbated by the inbreeding-caused low rate of

natural population growth.

**B.     The Research and Recovery Permit (Permit TE-091551-7)**

42.     On November 23, 2011, FWS issued to itself Permit TE-091551-7.

The permit renewed the existing Research and Recovery Permit for the Mexican

Wolf Recovery Program issued pursuant to ESA Section 10(a)(1)(A), which has governed the capture and take of "experimental, non-essential" wolves within the Mexican Wolf Experimental Population Area.

43.    Like previous permits, Permit TE-091551-7 allows the take of "experimental, non-essential" wolves "in a manner consistent with a USFWS-approved management plan and special management measure adopted by the USFWS … as well as to conduct activities related directly to the conservation, protection, and recovery of reintroduced nonessential experimental populations of Mexican gray wolves within Arizona and New Mexico."

44.    Permit TE-091551-7, however, differs from previous permits in an important respect.  The previous permit, Permit TE-091551-6, applied only to the "experimental, non-essential" wolf population.  The new permit amended the prior Research and Recovery Permit to authorize the take of endangered wolves outside of the Experimental Population Area.  The amended permit provides that "Authorized Permittees may also take *any* gray wolf (*Canis lupus*) in Arizona and New Mexico outside the Blue Range Wolf Recovery Area according to the terms and conditions below, with the exception of purposeful lethal take [emphasis added]."

45.    Permit TE-091551-7 authorizes permittees "to conduct activities related directly to the propagation, management, and recovery of captive and free-ranging Mexican gray wolves in accordance with USFWS-approved, current

Complaint for Declaratory and Injunctive Relief                           15

management plans and protocols for the Mexican Wolf Recovery Program" for

scientific research and recovery purposes.

46.     Specifically, Permit TE-091551-7 authorizes:

> all actions related to: capture via leg-hold traps, helicopter or ground
> darting and net-gunning; handle; possess; administer health care;
> propagate; radio collar; release; obtain and preserve blood, tissue,
> semen, ova, and other samples; translocate; transport between
> approved Mexican gray wolf captive management facilities in the
> United States and Mexico, and to approved release sites; purposeful
> lethal take (lethal control is limited to wolves within the
> experimental nonessential (10(j)) area in Arizona and New Mexico);
> hazing via less-than-lethal projectiles; injurious harassment; plus
> carry out any other USFWS-approved husbandry practice or
> management action for Mexican wolves within Region 2.

47.     According to Permit TE-091551-7, "Authorized Permittees" include

designated employees of FWS, USDA Wildlife Services, the Arizona Game and

Fish Department, the New Mexico Game and Fish Department, Apache Sitgreaves

National Forest, the San Carlos Apache Tribe, the Turner Endangered Species

Fund, and other entities, as well as personnel under the direct supervision or

direction of these employees.

48.     On November 7, 2011, FWS issued its Intra-Service Biological and

Concurrence Opinion ("Intra-Service Biological Opinion") for Permit TE-091551-

7.  In issuing Permit TE-091551-7, FWS was both the federal action agency and

the consulting agency under ESA Section 7, so the Intra-Service Biological

Opinion reflects a self-consultation.

49.     The Intra-Service Biological Opinion acknowledges that Permit TE-

091551-7 applies to wolves that disperse from releases within Mexico or disperse

from the Northern Rocky Mountain population in the United States. The Intra-Service Biological Opinion further acknowledges that any such wolves are fully protected as endangered under the ESA unless evidence establishes that they are part of the "experimental, non-essential" population.

50.    The Intra-Service Biological Opinion acknowledges that wolves released in Mexico that cross the international border "will further the conservation and recovery of the species by improving the species' baseline and will contribute to the goals of the Mexican Wolf Recovery Program."  The Biological Opinion further states that FWS recommends "that the Mexican Wolf Recovery Program actively promotes recovery of wolves to suitable habitat in Mexico and promotes establishment of wolves in the U.S. through natural dispersal."

51.    In support of the authority to capture endangered wolves, the Intra-Service Biological Opinion states that "[t]he adverse effects of capture and translocation or incorporation of a wolf into the captive breeding population is outweighed by the beneficial effects on the species' survival and recovery by reducing human and livestock conflicts within the action area."

52.    Since October 2011, Mexican officials have released at least 14 Mexican gray wolves within possible wolf dispersal distance of the international border.  Additional releases within Mexico are likely.

**GENERAL ALLEGATIONS**

53.     Under the terms of Permit TE-091551-7, endangered wolves that enter Arizona and New Mexico from Mexico or the Northern Rocky Mountains population can be captured or trapped and relocated to the Mexican Wolf Experimental Population Area (where they will be treated for all purposes as part of the nonessential experimental population), returned to Mexico, or placed indefinitely in a captive breeding facility.  Thus, Permit TE-091551-7 can transform fully protected endangered wolves into "experimental, non-essential" wolves.

54.     As FWS acknowledges, the "[c]apture and translocation or incorporation of a wolf into the captive breeding population has inherit risks such as injury or death."  The Intra-Service Biological Opinion, however, understates the risk of injury and death due to capture and translocation.  On the Center's information and belief, 18 wolves of the "experimental, non-essential" population have died as a consequence of capture efforts, indicating that the risk of injury or death due to capture and translocation is significant.

55.     Captured endangered wolves that are translocated to the Mexican Wolf Experimental Population Area will be subject to permitted lethal take and recapture.  On the Center's information and belief, 12 wild wolves have been deliberately killed by federal personnel since reintroduction began.

56.     It is likely that wolves released in Mexico will cross the international border and disperse into their historic range in southeastern Arizona and

southwestern New Mexico.  Should these wolves (or wolves from the Northern Rocky Mountain population) disperse into Arizona or New Mexico, they will not be part of the "experimental, non-essential" population but must be fully protected as endangered under the ESA.

57.    Unconfirmed reports indicate that at least one wolf released in Mexico in 2012 may have already crossed the international border into the United States.

58.    On the Center's belief and information, capacity within the 51 Mexican gray wolf holding facilities in the United States and Mexico allows for approximately 300 wolves, and that capacity has long been close to filled.  Due to lack of available space, breeding in captivity has long been curtailed through separation of male and female wolves during breeding season and, where that is not practicable, through birth-control drugs.  The vast majority of Mexican gray wolves held in captivity are not allowed to breed, very few litters of Mexican wolves have been recruited into the captive population in recent years, and one of the three lineages of Mexican wolves originally bred in captivity has lost important genetic diversity in captivity due to curtailment of breeding.  Thus, the FWS has minimal capacity to "propagate" Mexican gray wolves through the capture and indefinite captivity of endangered wolves.

59.    Permit TE-091551-7 violates the ESA, was undertaken without notice and an opportunity for public comment, and without compliance with NEPA.

## FIRST CLAIM FOR RELIEF
(Violation of ESA Section 10(a)(1)(A))

60.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

61.    Section 10(a)(1)(A) of the ESA provides a limited exception to the ESA's prohibition of take of endangered or threatened species for acts undertaken "for scientific purposes or to enhance the propagation or survival of the affected species."  16 U.S.C. § 1539(a)(1)(A).

62.    The capture and translocation or indefinite captivity of endangered wolves authorized by Permit TE-091551-7 does not serve a scientific purpose or to enhance the propagation or survival of the Mexican gray wolf.

63.    The capture and translocation or indefinite captivity of endangered wolves authorized by Permit TE-091551-7 will not, on balance, have a beneficial effect on the survival or recovery of the Mexican gray wolf.  On the contrary, the capture and relocation of Mexican gray wolves from their historic range outside the Mexican Wolf Experimental Population Area is inconsistent with the Intra-Service Biological Opinion's conservation recommendation that FWS promote "establishment of wolves in the U.S. through natural dispersal."

64.    Permit TE-091551-7 is inconsistent with the criteria for issuing permits for scientific purposes or for the enhancement of propagation or survival according to FWS's regulations.

65.    50 C.F.R. § 17.22(a)(2)(i) provides that FWS must consider "[w]hether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit."  Permit TE-091551-7 is inconsistent with 50 C.F.R. § 17.22(a)(2)(i) because no substantial evidence indicates that the permit's purported "scientific research and recovery purposes" justify removing endangered wolves from the wild or changing their status from endangered to nonessential experimental through translocation.

66.    50 C.F.R. § 17.22(a)(2)(iii) provides that FWS must consider "[w]hether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed."  The 1982 Mexican Wolf Recovery Plan calls for the establishment of two viable populations in the species' historic range in the United States and/or Mexico.  To date, only one population has been established in the United States, and it has not attained viability.  The Mexican releases are the basis for a second population, yet Permit TE-091551-7 undermines the viability of this nascent second population by authorizing endangered wolves to be captured, translocated, and converted to "experimental, non-essential" wolves, or simply kept in captivity.  Permit TE-091551-7 is inconsistent with 50 C.F.R. § 17.22(a)(2)(iii) because neither the permit nor the Intra-Service Biological Opinion disclose or evaluate this inconsistency.

67.    50 C.F.R. § 17.22(a)(2)(iv) provides that FWS must consider "[w]hether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit."  The permit is inconsistent with 50 C.F.R. § 17.22(a)(2)(iv) because no substantial evidence indicates that the permit's purported "scientific research and recovery purposes" would be likely to reduce the threat of extinction facing Mexican gray wolves.  On the contrary, the permit is likely to result in additional take of endangered wolves, both directly through the effects of capture and translocation or indefinite captivity and also indirectly through the effects of lethal take if endangered wolves are translocated to the Mexican Wolf Experimental Population Area.

68.    The Intra-Service Biological Opinion includes an incidental take statement permitting the incidental take of up to three Mexican gray wolves due to harm or mortality during the life of the permit pursuant to ESA Section 10(a)(1)(B).  Permit TE-091551-7, however, is a research and recovery permit issued pursuant to ESA Section 10(a)(1)(A).  By authorizing incidental take in connection with a Section 10(a)(1)(A) permit, FWS violated the plain terms of the ESA and its own ESA regulations.

## SECOND CLAIM FOR RELIEF
(Violation of ESA Section 10(c))

69.    Each and every allegation set forth in this Complaint is incorporated herein by reference.

70.     Section 10(c) requires the Secretary to publish notice of each application for a permit for scientific purposes or to enhance the propagation or survival of an endangered or threatened species in the Federal Register and to provide a 30-day comment period for the submission of "written data, views, or arguments with respect to the application."

71.     Although Permit TE-091551-7 substantially amends preceding permits because it allows the capture and take of endangered wolves, on the Center's information and belief FWS failed to provide notice of the application in the Federal Register and failed to provide any opportunity to comment on the proposed permit.  By failing to observe these mandatory procedures, FWS violated section 10(c) of the ESA.

### THIRD CLAIM FOR RELIEF
(Violation of ESA Section 7(a)(2))

72.     Each and every allegation set forth in this Complaint is incorporated herein by reference.

73.     ESA Section 7(a)(2) requires that each federal agency must "insure" that its actions are not likely to jeopardize the continued existence of any endangered or threatened species.

74.     A Biological Opinion must evaluate the direct, indirect, and cumulative effects of the action on listed species.

75.     A consultation pursuant to ESA Section 7(a)(2) must be based on the "best scientific and commercial data available."

76.     The Intra-Service Biological Opinion violates the ESA because it does not ensure that the FWS's actions, including the capture and translocation or indefinite captivity of endangered wolves, are not likely to jeopardize the continued existence of the Mexican gray wolf.

77.     The Intra-Service Biological Opinion violates the ESA because FWS failed to consider all effects of authorizing the capture and translocation of endangered Mexican gray wolves, including impairment of recovery efforts and indirect effects due to the de facto conversion of endangered wolves to "experimental, non-essential" wolves.

78.     The Intra-Service Biological Opinion violates the ESA because it is not based on the best available scientific evidence.  On the contrary, the best available scientific evidence indicates that the capture and translocation or indefinite captivity of endangered wolves does not promote the propagation, survival, or recovery of the Mexican gray wolf, and may harm the propagation, survival, and recovery of the species.

## FOURTH CLAIM FOR RELIEF
(Violation of NEPA)

79.     Each and every allegation set forth in this Complaint is incorporated herein by reference.

80.     The capture and translocation of endangered Mexican gray wolves authorized by Permit TE-091551-7 will result in significant direct, indirect, and cumulative impacts.

81.     Permit TE-091551-7 is a major federal action that requires FWS to comply with NEPA.

82.     FWS violated its non-discretionary NEPA duties by failing to perform any NEPA review before approving Permit TE-091551-7.

### PRAYER FOR RELIEF

WHEREFORE, the Center respectfully requests that the Court enter judgment providing the following relief:

1.     Declaring that Permit TE-091551-7 violates Sections 10(a)(1)(A) and 10(c) the ESA;

2.     Declaring that the Intra-Service Biological Opinion violates Section 7(a)(2) of the ESA;

3.     Declaring Defendants violated NEPA in connection with the issuance of Permit TE-091551-7;

4.     Enjoining any capture of endangered Mexican wolves outside the Mexican Wolf Experimental Population Area pursuant to Permit TE-091551-7 by Defendants or their Authorized Permittees;

5.     Invalidating Permit TE-091551-7's authorization of the capture of endangered Mexican gray wolves outside the Mexican Wolf Experimental Population Area;

6.     Setting aside the Intra-Service Biological Opinion for Permit TE-091551-7;

7.      Awarding the Center's costs, including reasonable attorney's fees and expert witness fees; and

8.      Providing such other relief as the court deems just and proper.


Dated:          March 28, 2013                    Respectfully Submitted,


                                                  s/ John Buse
                                                  John Buse (CA Bar No. 163156)
                                                  *pro hac vice* application pending
                                                  351 California Street, Suite 600
                                                  San Francisco, CA 94104
                                                  Telephone:    (323) 533-4416

                                                  Amy Atwood (OR Bar No. 060407)
                                                  *pro hac vice* application pending
                                                  PO Box 11374
                                                  Portland, OR 97211-0374
                                                  Telephone:    (503) 283-5474

                                                  Attorneys for Plaintiff
                                                  CENTER FOR BIOLOGICAL
                                                  DIVERSITY